**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**BRENDA L. JAMES,**                                Case No. 1:19 CV 570

    Plaintiff,

    v.                                         Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                                 MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff Brenda L. James ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 10). For the reasons stated below, the undersigned reverses the decision of the Commissioner and remands for further proceedings consistent with this opinion.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB in June 2016, alleging a disability onset date of March 31, 2011. (Tr. 275-76).[1] Her claims were denied initially and upon reconsideration. (Tr. 202-04, 210-12). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 217-18). Plaintiff

---

1. Plaintiff also filed a previous application for benefits relative to which she testified before an ALJ on October 23, 2014 (Tr. 34-97); the ALJ denied her application in a written decision on March 25, 2015 (Tr. 149-60), and the Appeals Council denied review (Tr. 166-71). Plaintiff thus later amended her alleged onset date in the instant case to March 26, 2015. (Tr. 303).

(represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on November 22, 2017. (Tr. 99-144). On May 16, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 10-24). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on March 14, 2019. (Doc. 1).

## FACTUAL BACKGROUND

Personal Background and Testimony

Born in 1962, Plaintiff was 52 years old on her amended alleged onset date. *See* Tr. 275, 303. She originally alleged disability due to lupus, rheumatoid arthritis, fibromyalgia, and pain in her back, hips, knees, and hands. (Tr. 311).

In a July 2016 function report, Plaintiff described symptoms of fatigue and pain her back, legs, hands, neck, and shoulders; she also cited concentration and memory difficulties. (Tr. 338). She did not need reminders to take care of personal needs, but put her medication in cups to remember to take it. (Tr. 339).

At the hearing, Plaintiff testified that in 2015, she was able to vacuum (with breaks), make simple meals, load laundry, and drive short distances; her husband shopped, carried the laundry up and down the stairs, and cooked. (Tr. 107-10); *see also* Tr. 339. She watched television for four to five hours per day, and listened to music for an hour or two. (Tr. 340).

Plaintiff testified she stopped working in 2011 because she tore her ACL and had knee surgery. (Tr. 116). She described pressure from her back to her legs which caused her legs to go numb; this also started in 2011. (Tr. 120). Plaintiff's physicians recommended back surgery in 2015, but she continued with physical therapy and pain medication. (Tr. 121). Aquatic therapy

helped, as long as she stayed warm, but the relief did not last. (Tr. 121-22). Plaintiff was no longer taking narcotic pain medications at the time of the hearing. (Tr. 123).

Plaintiff also testified her condition had worsened since the prior ALJ's decision, specifically citing her rheumatoid arthritis symptoms such as hand cramps and stiffness. (Tr. 127-29). Plaintiff wore hand braces both day and night; she was only wearing a brace on her right hand at the hearing because she could not find the left one. (Tr. 130). Plaintiff also testified she had fibromyalgia for which she took Celebrex and vitamin D. (Tr. 131). She also described pain as well as memory loss and concentration difficulties which she attributed to her fibromyalgia. (Tr. 131-32). She stated she had these problems "for probably about the past five, ten years." (Tr. 132). Pain sometimes interfered with her ability to concentrate. *Id.* She had difficulty finishing tasks and concentrating on television programs. (Tr. 132-33). She stated the concentration problems occurred over "more or less the last two years." (Tr. 133).

Relevant Medical Evidence

*Physical Health*

In a June 2014 visit for fibromyalgia, Plaintiff reported intermittent stiffness in her neck and shoulders rated 8/10. *See* Tr. 398. She also reported hand pain, and left knee/leg pain. *Id.* Celebrex helped, but she stopped taking it due to cost; she took Motrin three times per day. *Id.* In July 2014, Plaintiff reported 7/10 "head to toe" pain, including in her shoulders bilaterally. *See id.* She used Motrin, Tylenol, heat, ice, and arthritis creams as needed. *Id.* Plaintiff underwent occupational therapy for her bilateral wrist and thumb pain symptoms. (Tr. 466-67).

In September 2014, Plaintiff underwent an initial pain management evaluation for fibromyalgia. (Tr. 456). She reported pain all over her body that was aching, burning, dull, and sharp, and rated 7/10. *Id.* On examination, Plaintiff had tenderness in her neck, and limited range

of motion with lateral bending bilaterally. (Tr. 458). The provider prescribed trials of Celebrex, Lyrica, and Zanaflex; she also recommended aquatic therapy. *Id.*

A November 2014 lumbar spine x-ray revealed bilateral spondylosis at L5, severe disc space narrowing at L5-S1, and grade 2 anterolisthesis of L5 on S1. *See* Tr. 433. She underwent a lumbar medial branch nerve block, which provided 80 percent symptom relief for six hours. (Tr. 434). At a December 2014 visit for pain management, Plaintiff reported low back and bilateral hip pain from fibromyalgia. (Tr. 431-32). On examination, her neck had good range of motion. (Tr. 433). She had tenderness over her bilateral lumbar facets, a positive facet loading test on the left, tenderness over the bilateral lumbar paraspinal muscles, and difficulty transitioning from sitting to standing. *Id.* Diagnoses included fibromyalgia, bilateral knee pain, secondary osteoarthritis of multiple sites, lumbago, anterolisthesis, and spondylisthesis. (Tr. 434)

In January 2015, Plaintiff reported neck pain radiating to her shoulders, rated 6/10. (Tr. 422). On examination, she had tenderness in her feet, hands, shoulders, knees, hips, and back. (Tr. 423). Diagnoses included secondary osteoarthritis, fibromyalgia, knee pain, hand pain, and fatigue. *Id.* She was referred to physical therapy. (Tr. 424). At another appointment that same month, a physician noted Plaintiff would require an L4-S1 fusion with interbody grafts. (Tr. 427).

At a February 2015 pain management visit, Plaintiff continued to report neck and bilateral shoulder pain, which she rated as 5/10. (Tr. 417-18). On examination, Plaintiff had good range of motion in her neck, and minimal pain with extension. (Tr. 419). She had full range of motion in her back, and no pain on palpation of the lumbar spine; however, she had tenderness over the bilateral lumbar paraspinal muscles. *Id.*

At several visits in March, Plaintiff continued to report neck pain radiating to her upper back; she rated the pain as 4-5/10. (Tr. 409, 412). She noted the pain started four years prior and

had been persistent. (Tr. 409). On examination, Plaintiff had good neck range of motion, but tenderness over the left cervical paraspinal muscles, and decreased left shoulder range of motion due to pain. (Tr. 410). She had full strength and sensation. (Tr. 410-11). At another visit, she had diffuse tenderness in her neck and back, but full range of motion. (Tr. 414). A cervical spine x-ray revealed degenerative changes at C5-6 and C6-7, as well as moderate bilateral neural foraminal narrowing at the left C6-7. *See* Tr. 502.

Plaintiff returned to pain management in June and July describing neck, bilateral shoulder, and lower back pain. (Tr. 403, 405). On examination, she had normal strength and muscle tone; she had pain to palpation over the right cervical paraspinal muscles and limited range of motion and pain with extension and flexion. (Tr. 404, 407). She was noted to have "chronic pain secondary to fibromyalgia." (Tr. 404, 407). Her provider diagnosed cervical spondylosis and facet arthropathy in addition to fibromyalgia; she recommended physical therapy and a cervical facet medial branch block. *See* Tr. 404, 407.

In September 2015, Plaintiff continued to report "all over" pain, including in her feet, hands, shoulders, knees, and hips. (Tr. 397-98). On examination, she had full range of motion, but diffuse tenderness in her neck and back, as well as in her hips, knees, feet, shoulders, and hands. (Tr. 399). Her strength was intact. *Id.* She had "findings consistent with generalized pain due to chronic fibromyalgia (sites of pain all over)". *Id.* The provider recommended over-the-counter arthritis cream for painful joints, acetaminophen, Celebrex, and heat/ice. (Tr. 400).

In November 2015, Plaintiff described low back and neck pain rated 8/10; it was aggravated by physical activity. (Tr. 393). Notes indicate Plaintiff was scheduled to have a cervical facet medial branch block, but she had cancelled. (Tr. 394). On examination, she had tenderness over the right cervical facets. *Id.* The provider's assessment was "chronic pain secondary to

fibromyalgia; presenting with neck pain radiating to right shoulder and low back pain." *Id.* The provider's plan was physical therapy and a right cervical medial branch block. (Tr. 395).

*After Date last Insured*[2]

In January 2016, Plaintiff saw a physical therapist, describing chronic neck and back pain over the prior 5 years. (Tr. 389-90). On examination, the therapist noted moderate limitation in cervical flexion, retraction, and rotation, and major limitation in extension. (Tr. 390-91). Plaintiff also had major limitation in lumber flexion and extension, and moderate limitation in sideglide right and left. (Tr. 391). The provider described "moderate to severe loss of motion in the cervical and lumbar spine." *Id.*

In April 2016, Plaintiff continued to report bilateral neck and shoulder pain rated 7/10; it was aggravated by physical therapy and exercise. (Tr. 383). On examination in April, and again in August, Plaintiff continued to have tenderness in multiple locations including her neck and back, as well as full range of motion. (Tr. 385, 696).

*Mental Health*

Plaintiff did not have any mental health treatment prior to her December 31, 2015 date last insured. In March 2016, Plaintiff saw Jose Mendoza, M.D. to follow up on her lower back pain, as well as "discuss attention concerns" (Tr. 552). Plaintiff reported she used to be on ADHD medication "years ago" and would like to go back on them. *Id.* Dr. Mendoza's notes indicate

---

2. Plaintiff's date last insured for DIB was December 31, 2015. (Tr. 13). Thus, she must establish disability before that date. *See Garner v. Heckler*, 745 F.2d 383, 390 (6th Cir. 1987). "Evidence of disability after the expiration of insured status is generally of little probative value." *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004). Record medical evidence from after a claimant's date last insured is only relevant to a disability determination where the evidence relates back to the claimant's limitations prior to the date last insured. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (medical evidence after date last insured was only minimally probative of claimant's condition before date last insured, so did not affect disability determination).

Plaintiff's condition "started more than 1 month ago." *Id.* Plaintiff reported sleep disturbance, dysphoric mood, agitation, and nervousness. (Tr. 554). On examination, she had a normal mood and affect. *Id.* Dr. Mendoza diagnosed fibromyalgia and attention deficit disorder; he referred Plaintiff to neurology to follow up. (Tr. 555).

In April 2016, Plaintiff saw neurologist Sanjay Parikh, M.D. (Tr. 582-84). Dr. Parikh noted that based on Plaintiff's history it was "[his] impression that she does have a combined type of ADHD, which has been there since early childhood, but lately the symptoms are being aggravated by her lack of sleep, chronic pain and medical conditions." (Tr. 582).[3] He assessed, *inter alia*, ADHD, and prescribed Tenex. (Tr. 584).

Plaintiff returned to Dr. Parikh the following month, reporting the Tenex was not helping. (Tr. 685). However, Dr. Parikh also noted Plaintiff was "feeling a little better on Tenex." *Id.* She reported memory loss and "[f]orgetting simple things." *Id.* Dr. Parikh ordered an EEG and instructed Plaintiff to continue the medication. (Tr. 685-86).

In June 2016, Dr. Parikh noted Plaintiff "ha[d] done well with her Tenex and she can tell a big difference when on the medication compared to off the medication." (Tr. 688). Dr. Parikh continued the Tenex and instructed Plaintiff to return in three months. *Id.* Dr. Parikh made the same comments in November 2016, and instructed Plaintiff to return in six months. (Tr. 690).

Opinion Evidence

*Physical Health*

In August 2016, State agency physician Esberdado Villanueva, M.D., reviewed Plaintiff's records. (Tr. 179-81). He offered an RFC that was an adoption of the March 2015 ALJ decision,

---

3. Plaintiff scored 30/36 on a diagnostic checklist for inattentive-type ADHD and 29/36 for hyperactive-type ADHD. (Tr. 582).

citing Acquiescence Ruling 98-4. (Tr. 180). The RFC included the ability to lift or carry 20 pounds occasionally and 10 pounds frequently, standing/walking/sitting six hours in an eight-hour workday, a sit/stand option at 30-minute intervals, some postural restrictions, avoiding concentrated exposure to temperature extremes, and avoiding all exposure to hazards. (Tr. 179-80).

In October 2016, State agency physician Gerald Klyop, M.D., reviewed Plaintiff's records. (Tr. 191-93). He offered the same RFC as Dr. Villanueva. (Tr. 193).

*Mental Health*

In August 2016, State agency physician Aracelis Rivera, Psy.D., reviewed Plaintiff's records and opined there was not sufficient evidence to assess Plaintiff's mental condition prior to her date last insured. (Tr. 177).

In October 2016, State agency physician Jennifer Swain, Psy.D., opined Plaintiff had medically determinable impairments of affective disorders, anxiety disorders, and ADD/ADHD, but these were non-severe. (Tr. 189). She further opined Plaintiff had no limitation in activities of daily living, maintaining social functioning, or repeated episodes of decompensation; however, she did have "mild" difficulties in maintaining concentration, persistence, or pace. *Id.* She noted that "[w]hile current evidence does support new condition of ADHD, it does not appear to be severe." *Id.*

<u>VE Testimony</u>

A VE testified at the hearing before the ALJ. (Tr. 135-43). The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, work experience, and residual functional capacity ("RFC") as ultimately determined by the ALJ. *See* Tr. 137-38. The VE responded that such an individual could perform Plaintiff's past work as a check cashier, and also

perform other jobs such as storage facility rental clerk, mail clerk, and hand packager. (Tr. 137-38).

<u>ALJ Decision</u>

In her May 16, 2018 opinion, the ALJ found Plaintiff met the insured status requirements for DIB through December 31, 2015, and had not engaged in substantial gainful activity from her amended alleged onset date of March 26, 2015 through her date last insured. (Tr. 13). The ALJ found Plaintiff had severe impairments of lumbar degenerative disc disease, fibromyalgia, obesity, osteoarthritis/degenerative joint disease of the right knee, and bilateral hip arthritis (Tr. 13); none of these impairments – individually or in combination – met or medically equaled the severity of a listed impairment (Tr. 15). The ALJ also specifically found that Plaintiff's affective disorder and anxiety disorder "did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and were therefore nonsevere." (Tr. 13). The ALJ then determined Plaintiff had the RFC:

> to perform light work as defined in 20 CFR 404.1567(b) except: occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; stand and walk 6 hours of an 8-hour workday; sit for 6 hours of an 8-hour workday; should be afforded the opportunity to alternate between sitting and standing at 30 minute intervals; unlimited push and pull other than shown for li[f]t and/or carry; occasionally climb ramps and stairs; never limb ladders, ropes and scaffolds; occasionally stoop, kneel, crouch and crawl; avoid concentrated exposure to extreme cold and extreme heat; avoid all exposure to hazards, such as dangerous machinery and unprotected heights; frequent handling and fingering bilaterally.

(Tr. 17). Given Plaintiff's age, education, work experience, and RFC, the ALJ determined that Plaintiff could – through her date last insured – perform her past relevant work as a check cashier. (Tr. 22). Therefore, the ALJ determined Plaintiff was not disabled. (Tr. 24).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.      Was claimant engaged in a substantial gainful activity?

2.     Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.     Does the severe impairment meet one of the listed impairments?

4.     What is claimant's residual functional capacity and can claimant perform past relevant work?

5.     Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff contends the ALJ erred: 1) by failing to include in the RFC limitations due to Plaintiff's neck problems and attention/concentration difficulties; and 2) by failing to properly evaluate Plaintiff's subjective symptoms – specifically those related to fibromyalgia – pursuant to SSR 16-3p, and SSR 12-2p. For the reasons discussed below, the undersigned finds no error in the ALJ's decision not to include further neck limitations in the RFC, but reverses and remands for an explained credibility/subjective symptom analysis that properly considers Plaintiff's fibromyalgia symptoms and further explanation of the ALJ's consideration of Plaintiff's non-severe mental impairments.

<u>Subjective Symptoms / Fibromyalgia</u>

Plaintiff contends the ALJ erred in evaluating her subjective symptom reports, particularly in the context of her fibromyalgia. The undersigned agrees and finds remand necessary on this issue.

Fibromyalgia "is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 n.3 (6th Cir. 2007) (quoting STEDMAN'S MEDICAL DICTIONARY FOR HEALTH PROFESSIONALS AND NURSING, 542 (5th ed. 2005)); *see also* SSR 12–2p, 2012 WL 3104869, at *2 (fibromyalgia is a "complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months"). Diagnosing fibromyalgia involves "observation of the characteristic tenderness in certain focal points, recognition of hallmark symptoms, and 'systematic' elimination of other diagnoses." *Rogers*, 486 F.3d at 244 (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988)). "[P]hysical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion." *Preston*, 854 F.3d at 818.

This makes the credibility/subjective symptom determination particularly important where a claimant has been diagnosed with fibromyalgia. "Opinions that focus solely upon objective evidence are not particularly relevant" due to "the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia." *Rogers*, 486 F.3d at 245. Cases involving fibromyalgia "place[] a premium . . . on the assessment of the claimant's credibility." *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp.2d 986, 990 (N.D. Ohio 2003). This is so because "unlike

medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Rogers*, 486 F.3d at 243.

Social Security Ruling 12–2, Evaluation of Fibromyalgia, "provides guidance on how we develop evidence to establish that a person has a medically determinable impairment of fibromyalgia, and how we evaluate fibromyalgia in disability claims . . . ." 2012 WL 3104869, at *1. The Ruling also states that fibromyalgia should be analyzed under the traditional five-step evaluation process used for analyzing other claims for disability. *Id.* at *5–6.

"Nonetheless, a diagnosis of fibromyalgia does not automatically entitle [a claimant] to disability benefits." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008). "Some people may have a severe case of fibromyalgia as to be totally disabled from working but most do not, and the question is whether claimant is one of the minority." *Id.* at 806; *see also Stankoski v. Astrue*, 532 F. App'x 614, 619 (6th Cir. 2013) ("But a diagnosis of fibromyalgia does not equate to a finding of disability or an entitlement to benefits."). And ultimately, it is for the ALJ, not the reviewing court, to judge the credibility of a claimant's statements. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007).

The Sixth Circuit has recognized that pain alone may be disabling. *See King v. Heckler*, 742 F.2d 968, 972 (6th Cir. 1984). However, an ALJ is not required to accept a claimant's subjective report of symptoms, rather she must make a credibility determination. In making this determination and considering whether a claimant has disabling pain, an ALJ must consider: 1) daily activities; 2) location, duration, frequency, and intensity of pain or symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment, other than medication, to relieve pain; and 6) any other measures used to relieve pain. 20 C.F.R. § 404.1529(c)(3); *see also* SSR 16-3p, 2017 WL5180304. "Discounting

credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). The ALJ's credibility determination "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers*, 486 F.3d at 248.

The ALJ here recognized Plaintiff's fibromyalgia and found it to be a severe impairment. (Tr. 13). At Step Three, she cited the fibromyalgia listing generally, quoting the 2010 ACR Preliminary Diagnostic Criteria, and stated generically that she "ha[d] given consideration to all the foregoing factors during the sequential evaluation at Step 3, Step 4 and Step 5, and ha[d] given consideration to SSR 12-2p." (Tr. 16). At Step Four, the ALJ acknowledged Plaintiff's fibromyalgia in the description of her symptoms, and then provided a boilerplate subjective symptom / credibility paragraph:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(Tr. 18).

In *Cox v. Commissioner of Social Security*, the Sixth Circuit explained that other Circuit Courts have criticized boilerplate credibility findings, "finding the language unhelpful". 615 F. App'x 254, 260 (6th Cir. 2015). The Sixth Circuit's "chief concern with the popularity of this template, however, is the risk that an ALJ will mistakenly believe it sufficient to *explain* a credibility finding, as opposed to merely introducing or summarizing one." *Id.* (emphasis in original). Such boilerplate language "explains the extent to which the ALJ discredited Appellant's testimony, but not her reasons for doing so." *Id.* The *Cox* court, however, stopped short, of finding

the use of the boilerplate language reversible in and of itself; rather, it explained that it is only when the ALJ substitutes the boilerplate for an explanation of the credibility finding and fails to explain her reasons for the credibility determination that use of the boilerplate constitutes error. *Id.* The ALJ committed that error here with respect to Plaintiff's subjective symptoms related to her fibromyalgia.

In her RFC analysis, the ALJ repeatedly stated that after "[c]onsidering the objective medical evidence", she included certain limitations in the RFC. *See* Tr. 19 ("Considering the objective medical evidence, the undersigned finds that the claimant would be limited in her ability to lift, carry, and climb."); Tr. 20 ("Considering the objective medical evidence, the undersigned finds that the claimant would be limited in her ability to tolerate extreme temperatures, as well as handle and finger bilaterally."); Tr. 20 ("Considering the objective medical evidence, the undersigned finds that the claimant would be limited in her ability to stand, walk and crouch."). Moreover, at the end of the RFC discussion, the ALJ concluded:

> In sum, the above [RFC] assessment is supported by medical imaging showing degenerative disc disease and severe bilateral neural foraminal narrowing, a treating history of injections to the lumbar spine, right knee, and bilateral hips, and treatment for chronic all over pain. However, normal gait and treatment records that show that the claimant was doing well overall indicate that she may not be as limited as she purports."

(Tr. 21-22).

The Sixth Circuit has explained that "[i]n light of the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia, opinions that focus solely upon objective evidence are not particularly relevant." *Rogers*, 486 F.3d at 245. This is not to say that the ALJ's analysis was incorrect or that she should not have considered the objective evidence; it was certainly relevant to Plaintiff's numerous other physical conditions. Rather, it is to say that this does not provide a sufficient rationale for discounting fibromyalgia symptoms. The medical

record is replete with complaints of pain that Plaintiff – and her providers – attribute at least in part to fibromyalgia. *See* Tr. 393-94, 397-99, 403-07, 411-12, 417-20, 422-23, 431-32, 456-58.

The only other discussion of Plaintiff's fibromyalgia and related symptoms consists of two paragraphs discussing the diagnosis, some examination findings, and treatment:

> In terms of the claimant's fibromyalgia, the record shows that the claimant was first diagnosed with fibromyalgia in 2010 (B1F/64). Records from July 2014 also show that the claimant began physical therapy to treat the pain in her wrists and thumbs (B1F/87).
>
> On September 30, 2015, the claimant underwent a consultative examination for her fibromyalgia. (B1F/8). The claimant reported that she had all over pain and back pain, rating the pain as 9 out of 10. Upon examination, the claimant had a normal gait and her strait [sic] leg raise was negative. Her bilateral upper and lower extremity coordination was intact (B1F/18). Physical treatment notes show that the claimant had polyarticular joint pain in her feet, hands, wrists, shoulders, knees, hips, groin, neck, and back (B1F/20). The claimant was recommended use of over-the-counter arthritis cream, such as Icy Hot, on her joints to treat her pain (B1F/21). She also was prescribed Celebrex to treat her fibromyalgia pain (B1F/21). Treatment notes from a pain management clinic in November 2015, shows that the claimant has chronic pain secondary to fibromyalgia. Upon examination, the claimant had positive tenderness over the right cervical facets (B1F/15). Considering the objective medical evidence, the undersigned finds that the claimant would be limited in her ability to tolerate extreme temperatures, as well as handle and finger bilaterally.

(Tr. 19-20). But again, none of this explains how the ALJ evaluated Plaintiff's subjective complaints of pain. Thus, the Court is left with the boilerplate credibility language, which the Sixth Circuit has explained "explains the extent to which the ALJ discredited [Plaintiff's] testimony, but not her reasons for doing so." *Cox*, 615 F. App'x at 260.

Given the nature of fibromyalgia, the fact that such cases "place[] a premium . . . on the assessment of the claimant's credibility", *Swain*, 297 F. Supp. 2d at 990, Plaintiff's complaints of chronic pain, the ALJ's repeated focus on the "objective medical evidence", and the ALJ's boilerplate subjective symptom analysis, the undersigned finds remand is necessary here. This is not to say the Plaintiff is necessarily disabled, as the Court recognizes that "a diagnosis of

fibromyalgia does not equate to a finding of disability or an entitlement to benefits." *Stankoski*, 532 F. App'x at 619. However, the ALJ's subjective symptoms analysis is not, in this context, "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers*, 486 F.3d at 248. Remand is thus required.

RFC

Plaintiff contends the ALJ erred by failing to include certain limitations in the RFC – namely, physical restrictions regarding the use of her neck and mental restrictions regarding attention and concentration based on her ADHD diagnosis.

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). "The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. § 416.946(c)). An ALJ's RFC determination must be supported by evidence of record, but it need not correspond to, or even be based on, any specific medical opinion. *See Brown v. Comm'r of Soc. Sec.*, 602 F. App'x 328, 331 (6th Cir. 2015). Instead, it is the ALJ's duty to formulate a claimant's RFC based on all the relevant, credible evidence of record, medical and otherwise. *Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013).

*Cervical Spondylosis*

The Commissioner incorrectly argues that Plaintiff "does not identify any limitations that the ALJ should have included in her RFC to accommodate her cervical spondylosis, but did not." (Doc. 13, at 8). In fact, in her opening brief, Plaintiff specifically noted that: "It is offered that the limited ability to turn her head would impact the decision whether Ms. James could perform her past relevant work or any work." (Doc. 12, at 16). The undersigned finds this a sufficiently clear

argument: Plaintiff contends the ALJ should have included restrictions on Plaintiff's ability to turn her head in the RFC.

However, the Commissioner is correct that there is no "treating source opinion or any medical source opinion that opines that she would require limitations greater than those opined by the ALJ" (Doc. 13, at 8) due to her cervical spondylosis. And the ALJ clearly considered Plaintiff's neck condition and associated pain, devoting two paragraphs to discussing the relevant evidence. *See* Tr. 19. Specifically, she considered the imaging evidence (*see* Tr. 19 (citing Tr. 502)), Plaintiff's subjective symptom complaints, and the findings of Plaintiff's physicians on examination (*see* Tr. 19 (citing Tr. 393-94, 397, 403-05, 409)). The ALJ also noted that although cervical medical branch blocks were recommended, Plaintiff "declined this course of treatment." (Tr. 19); *see also* Tr. 394 ("She was scheduled to have a cervical mbnb; however this was cancelled by patient."). At the conclusion of those paragraphs, the ALJ explained that, considering this evidence, "the undersigned finds that the claimant would be limited in her ability to lift, carry, and climb." *Id.* The undersigned finds the ALJ sufficiently considered Plaintiff's limitations as a result of her cervical spondylosis, and the ALJ's decision not to include further limitations in the RFC is supported by substantial evidence.

*Attention / Concentration Limitations*

Plaintiff next contends that the ALJ erred when she failed to include limiting effects from Plaintiff's ADHD in the RFC. Specifically, she asserts the ALJ failed to consider and assess Dr. Parikh's "opinions" and that "[e]ven if Ms. James only had a mild limitation in concentration, persistence or pace as the ALJ found, the ALJ committed legal error because she failed to include that limitation in the hypothetical question to the VE and RFC." (Doc. 12, at 18).

18

First, the undersigned agrees with the Commissioner that Dr. Parikh did not offer medical "opinions", as that term is defined by the regulations. The relevant regulation defines "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2); *see also Dunlap v. Comm'r of Soc. Sec.*, 509 F. App'x 472, 476 (6th Cir. 2012) (statements made by treating physician did not constitute an "opinion" as that term is defined in 20 C.F.R. § 404.1527(a)(2)); *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 647, 651 n.3 (6th Cir. 2009) ("In addition to the reasons for discounting Dr. McCord's responses provided by the ALJ, the second through fourth responses appear to be outside the scope of "medical opinions" as defined in 20 C.F.R. § 404.1527(a)(2). . . . Dr. McCord's responses to the final three questions address the general relationship between Allen's spinal condition and the symptoms/limitations it may cause, rather than addressing the specific extent of Allen's limitations.); *Bulick v. Colvin*, 2014 WL 2003049, at *1 (N.D. Ohio) ("Although it appears that Dr. Dang diagnosed plaintiff with depression and anxiety, there is no statement of 'nature and severity' of the symptoms or impairments, the prognosis, or any restriction Dr. Dang believes the depression or anxiety would cause plaintiff in a work setting. Therefore, the notes do not constitute 'opinion' evidence."); *Messina v. Comm'r of Soc. Sec.*, 2013 WL 1196597, at *1 (S.D. Ohio) (records containing only treatment notes are not "medical opinions" and, therefore, the treating source rule does not apply). Because Dr. Parikh did not offer opinions regarding Plaintiff's functional limitations, the ALJ did not err in failing to assign them specific weight.

Second, the Social Security Administration directs that "the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment". SSR 96-8p, 1996 WL 374184, at *4. Rather, a claimant's RFC is formulated at Steps Four and Five, "which requires a more detailed assessment by itemizing the various functions contained in the broad categories found in paragraphs B and C." *Id.* Courts have therefore explained that findings made at Step Three need not necessarily be incorporated into the RFC. *See Hayman v. Berryhill*, 2017 WL 9476860, at *9 (N.D. Ohio), *report and recommendation adopted*, 2018 WL 618049 ("Plaintiff's argument—that an ALJ's findings at Step Three, which address whether a claimant meets the requirements of a given Listing, must be incorporated into the RFC—is unsupported by case law."); *Ceol v. Berryhill*, 2017 WL 1194472, at *10 (E.D. Tenn.) ("Therefore, a finding by the ALJ that the Plaintiff has mild limitations in the areas of daily living activities, social functioning, and concentration, persistence, or pace, does not necessarily mean that the Plaintiff will have corresponding limitations with regard to her RFC."). Courts have also found, however, that an ALJ's failure to explain how a claimant's mild psychological limitations affect the RFC assessment constitutes reversible error where the ALJ makes no mention of these non-severe mental impairments in the RFC analysis. *See Ceol*, 2017 WL 1194472, at *10 ("[T]he ALJ was required to consider both severe and non-severe impairments in shaping the Plaintiff's RFC and the failure to do [so]is not harmless."); *Katona v. Comm'r of Soc. Sec.*, 2015 WL 871617, at *6 (E.D. Mich.) ("And to the extent an ALJ determines that an identified impairment, severe or *non-severe*, does not result in any work-related restrictions or limitations, the ALJ 'is required to state the basis for such conclusion.'" (quoting *Hicks v. Comm'r of Soc. Sec.*, 2013 WL 3778947, at *3 (E.D. Mich.)); *Patterson v. Colvin*, 2015 WL 5560121, at *5 (N.D. Ohio) (rejecting Magistrate Judge's conclusion that detailed findings at Step Three regarding non-severe mental impairments

rendered harmless any error in failing to explain their exclusion from in the RFC); *Seese v. Colvin*, 2017 WL 663550, at *14 (N.D. Ohio) ("[T]he ALJ does not include [Plaintiff's non-severe depression] in his RFC and he does not explain why Plaintiff's depression did not result in any work-related limitation."), *report and recommendation adopted*, 2017 WL 661679; *see also Doll v. Saul*, 2019 WL 3976295, at *7 (N.D. Ohio) ("Even though the ALJ stated in step two that Plaintiff's affective disorder 'has no effect on her ability to perform work-related activity on a regular and continuing basis,' the ALJ was still required to discuss the combination of all her 'severe' and 'non-severe' impairments in his RFC analysis."), *report and recommendation adopted* 2019 WL 3874354.

Accordingly, the Court's inquiry turns to whether the ALJ considered Plaintiff's non-severe mental impairments in formulating the RFC. This case is a less extreme example than those cited above where the ALJ most often completely failed to mention a non-severe mental impairment after Steps Two or Three. The ALJ here did discuss Plaintiff's "mild" mental impairment at Step Four in her assessment of the opinion evidence. Specifically, the ALJ assigned great weight to the initial state agency reviewing psychiatric consultant, Dr. Rivera, noting that his opinion that there was insufficient evidence about Plaintiff's mental impairments prior to her date last insured "is consistent with the medical evidence of record, which is devoid of any evidence of a mental impairment before December 31, 2015." (Tr. 21). The ALJ then acknowledged Plaintiff had "sought treatment for attention and concentration problems in April 2016 and those issues could have been present prior to the date last insured" *Id.* The ALJ reviewed the mental assessment by State agency physician Dr. Swain, which found Plaintiff had mild difficulties in concentration, persistence, and pace; she assigned it "great weight, as it is consistent with the medical record." (Tr. 21).

But in this discussion the ALJ in essence simply repeated her Step Two finding that Plaintiff had mild limitations in concentration, persistence, or pace and credited the State agency opinion so finding. She did not elaborate on her rationale for why this did not result in any limitation in the RFC. Again, as stated above, there is certainly no *requirement* that mild mental limitations be included in an RFC. But an ALJ must consider the combined effect of severe and non-severe impairments in formulating the RFC. Further, "to the extent an ALJ determines that an identified impairment, severe or *non-severe*, does not result in any work-related restrictions or limitations, the ALJ 'is required to state the basis for such conclusion.'" *Katona*, 2015 WL 871617, at *6 (quoting *Hicks*, 2013 WL 3778947, at *3). Because of this, and because remand is already required as described above, the undersigned instructs the Commissioner on remand to also explain the decision not to include these mild mental limitations in the RFC.[4]

It may well be that similar reasoning for why the ALJ found Plaintiff's concentration, persistence, and pace limits "mild" and her ADHD non-severe at Step Two, as well as her rationale that the record lacks evidence of any mental limitations prior to Plaintiff's date last insured also supports a determination that these mild limitations do not restrict work activity, and were thus not

---

4. The Commissioner contends that Plaintiff's symptoms improved as she started medication with Dr. Parikh and thus "there is no evidence that Plaintiff's symptoms lasted for twelve consecutive months, let alone at disabling levels for twelve consecutive months." (Doc. 13, at 11). This may be true as Dr. Parikh noted in June 2016, Plaintiff was doing well on her medication "and she can tell a big difference when on the medication compared to off the medication". (Tr. 688). He continued her medication and instructed her to return in three months, *id.*; five months later, he made the same comments and instructed her to return in six months (Tr. 690). However, this rationale was not offered by the ALJ. Rather, the ALJ stated that Plaintiff sought treatment for her attention and concentration problems after her date last insured "and those issues could have been present prior to the date last insured." (Tr. 21). Additionally, as the Commissioner points out, the State agency opinion noted that despite complaints of memory loss, Plaintiff remained capable of making meals, completing household chores, and playing cards. (Tr. 191). But again, this rationale was not offered by the ALJ. Rather, the ALJ credited mild limitations and noted that these issues "could have been present prior to the date last insured" (Tr. 21), but did not explain how this did (or did not) impact the RFC when considered in combination with Plaintiff's other impairments.

included in the RFC. However, it is for the ALJ to make this determination and provide an explanation in the first instance, not this Court.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB not supported by substantial evidence and reverses and remands that decision pursuant to Sentence Four of 42 U.S.C. § 405(g).

 s/ James R. Knepp II
United States Magistrate Judge